GERMENKO ET AL. v. PUBLIC SERVICE COMMISSION OF MARYLAND ET AL.

[No. 322, September Term, 1960.]

*Decided August 9, 1961.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Francis B. Burch* and *John T. Brooks,* with *Allen, Burch and Allen* on the brief, for the appellants.

*H. Donald Schwaab,* for C. Curtis Morgan Transportation Co., Inc., part of the appellees, and *Cornelius P. Mundy,* with *William G. Kerbin, Jr.,* and *France, Rouzer, Mundy & Harris* on the brief, for Scarborough Oil Co., Inc., the other appellee.

SYBERT, J., delivered the opinion of the Court.

The Public Service Commission, after a public hearing, filed on January 7, 1960 an opinion and order No. 54244, granting permits to Scarborough Oil Co., Inc. and C. Curtis Morgan Transportation Co., Inc. (Morgan Transportation), appellees, to operate as contract carriers of flammable liquids, in bulk, in tank vehicles, on public streets or roads in Maryland. The granting of the permits was opposed by John J. Germenko and others, appellants, who are certified contract carriers of flammables. A petition was filed by the appellants in the Circuit Court of Baltimore City under §§ 90 and 91 of Art. 78, Code (1957), for a decree declaring the order granting the permits null and void and for an injunction. Following a hearing on the petition, to which answers were filed by Scarborough, Morgan Transportation and the Commission, the chancellor signed an order affirming the order of the Commission and dismissing the petition. The petitioners entered this appeal from the chancellor's order.

The Commission issued the permits in question pursuant to § 33 (c) of Chap. 545 of the Acts of 1959, codified as Code (1959 Supp.), Art. 78, § 33 (c), sometimes referred to as the "grandfather clause". This section reads:

> "In the case of applications by contract carrier of flammables, no permit shall be issued unless the applicant was in bona fide operation as a contract carrier on June 1, 1954 and has continued such operations since that date; except, upon proof of public convenience and necessity."

The legislative history of this "grandfather clause" began in 1954, when by Chap. 58 of the Acts of that year § 19A was added to Art. 78 of the Code, thereby subjecting all carriers of flammable or combustible liquids to the jurisdiction of the

Commission, and requiring for the first time that such carriers obtain a permit from the Commission to carry on their operations, such permits being mandatory under the statute on and after September 1, 1954. The basis for the issuance of these permits was "public welfare and convenience." However, § 19A (d) enacted the original "grandfather clause," by which the Commission was also directed to issue permits to any carrier of flammables, applying within 90 days of the effective date of the statute, who had been in operation as such a carrier in Maryland on June 1, 1954, with no necessity to show justification under public welfare and convenience. Operation without a permit by any carrier of flammables on or after September 1, 1954, was declared a misdemeanor, punishable by fine.

Scarborough never applied under the provisions of the 1954 Act, while Morgan Transportation filed an application on February 2, 1955, well beyond the period stipulated for filing applications. However, while the record shows that on December 8, 1954, thirty-three applications were approved from among thirty-seven timely applications filed, no permits were actually issued to carriers until February 27, 1958, because of court proceedings involving appeals from the orders of the Commission in regard to the initial applications. In the meantime Scarborough and Morgan Transportation continued their carrier operations without permits. No formal action was ever taken by the Commission on Morgan Transportation's 1955 application.

The next legislative step was taken in 1955 when by Chap. 441 of the Acts of that year the Public Service Commission Law was revised. Among other things, the "grandfather clause" of the 1954 act was eliminated. As the chancellor pointed out, this probably was done in recognition of the fact that by then the rights under that clause had terminated. It then became necessary for a carrier to prove "public welfare and convenience" to obtain a permit. Morgan Transportation applied again on December 8, 1958, but its application was denied on the ground that, although it would have qualified under the "grandfather clause" of the 1954 act, its application was filed too late.

The last legislative act setting the stage for the present controversy occurred in 1959 when Chap. 545 was adopted, by its provisions making a distinction between contract and common carriers of flammables, and, among other things, enacting the so-called "grandfather clause", § 33 (c) of Art. 78, quoted above.

Both Scarborough and Morgan Transportation applied for permits under the provisions of the 1959 amendment, Morgan Transportation basing its application on the new "grandfather clause" while Scarborough applied on that ground as well as on that of "public convenience and necessity". Permits were subsequently issued to both carriers under the provisions of § 33 (c).

In challenging the correctness of the chancellor's dismissal of their petition for review and his affirmance of the Commission's order granting the permits, appellants contend: (1) that Chap. 545 of the Acts of 1959, codified in part as subsections (gg) and (hh) of § 2, and as § 33 (c) of Art. 78, Code (1959 Supp.), did not create new "grandfather" rights in regard to contract carriers of flammables; (2) that Scarborough and Morgan Transportation were not continuously engaged in "bona fide" carriage of flammables from September 1, 1954, as required by § 33 (c); (3) that Scarborough, as "the applicant", was not in operation as a contract carrier of flammables on June 1, 1954, and continuously thereafter, within the meaning of § 33 (c); and (4) that Morgan Transportation was a "private carrier" within the meaning of § 2 (hh) of Art. 78, and therefore was not required to have, or entitled to, a permit as a contract carrier of flammables. Appellants abandoned at oral argument the contention that Scarborough and Morgan Transportation were not continuously engaged in the transportation of flammables under individual written contracts or agreements of a term or duration of not less than 90 days, from June 1, 1954, as required by § 2 (gg) of Art. 78.

## (1)

The appellants' first contention is that the only proper interpretation of the 1959 version of the "grandfather clause"

set out in § 33 (c) is that it was meant to apply only to already qualified permit holders who have been operating both as contract and common carriers under their original, single permits, and that its purpose was to allow the issuance to them of separate, additional permits for contract carriage of flammables. They maintain that an interpretation recognizing new and unrelated "grandfather" rights would in effect countenance the violation of prior existing laws and infringe upon the vested rights of the present certificate holders. Appellants' reasoning is based on their interpretation of the legislative history leading up to § 33 (c). They first point out that following the passage of the 1954 act, this Court ruled, in *Baltimore Tank Lines v. P. S. C.,* 215 Md. 125, 137 A. 2d 187 (1957), that the Commission did not have the power to regulate the rates of contract carriers. This rendered impracticable, they say, rate supervision over those who held an original permit and operated both as common and contract carriers. The 1959 amendment added § 32 (a-2), by which for the first time two classes of permits were created, one for common and one for contract carriers of flammables. Appellants point out that the "grandfather clause" of § 33 (c) was made applicable only to *contract* carriers, and that, as before, applicants for permits as *common* carriers could qualify only upon proof of "public convenience and necessity". The appellants argue, therefore, that the intent and purpose of § 33 (c) was only to allow issuance of a second permit as contract carriers to those who were in bona fide operation on June 1, 1954 as both common and contract carriers, and continued as such lawfully since that date under the single permits issued pursuant to the 1954 statute. It follows, if this argument is valid, that Scarborough and Morgan Transportation would receive no new rights under the 1959 "grandfather clause" since they would not fall within the class intended to be benefitted thereby.

This interpretation was rejected by the Commission and found unacceptable by the chancellor in light of the legislative history of the act. We believe their conclusions are correct.

The cardinal rule in the construction of statutes is to give effect to the intention of the legislature, and in determining that intention the Court considers the language of an enact-

ment in its natural and ordinary signification, and, if there is no ambiguity on the face of it, there is no need for construction and the Court will give to the language used its apparent meaning. However, as Judge Prescott for the Court added in *Height v. State,* 225 Md. 251, 257, 170 A. 2d 212 (1961), "* * * when the words of a statute are of doubtful meaning, the Court, in determining legislative intent, will consider not only their usual and literal meanings, but their meaning and effect considered in the light of the setting, the objectives and purposes of the enactment, and the consequences that may result from one meaning rather than another, *Tyrie v. Baltimore County,* 215 Md. 135, 137 A. 2d 156, with the real legislative intent prevailing over literal intent."

The thorough historical search into the legislative intent made by the learned chancellor led him to conclusions that are both persuasive and logical, and contrary to the position of appellants. First, he pointed out that if the "grandfather clause" of the 1959 law was intended to apply only to those who had theretofore been granted permits, even though they were unissued, or only to those to whom permits were in fact issued, the date of the grant of the permits, December 8, 1954, or the date of their issuance, February 27, 1958, could have been stated in the law as the qualifying date, thereby conclusively excluding all others. By making June 1, 1954 the qualifying date, as in the earlier statute, the legislature made it abundantly clear, he felt, that what was intended for qualification under the "grandfather clause" of the later statute, was the same operation which would have qualified the applicant under the prior law, had he applied in time.

We might add that the interpretation contended for by appellants would require reading into the 1959 statute some such limiting words as "carriers operating *under permit*". However, courts are "generally not at liberty to surmise a legislative intent contrary to the letter of the statute, or to indulge in the license of inserting or omitting words with the view of making the statute express an intent which is not evidenced in the original form". *Tax Comm. v. Power Company,* 182 Md. 111, 116, 32 A. 2d 382 (1943). In addition, appellants' argument fails to take into account the fact that § 32 (d) (1)

and (2), enacted as part of the same act which established the 1959 "grandfather clause", provides that no person shall hold both a common and a contract carrier permit within the same territory.

Furthermore, as the chancellor pointed out, by a ruling of the Commission (Case No. 5364, Opinion filed July 12, 1956) only one type of permit was issued to carriers of flammables under the "grandfather clause" of the 1954 act, whether they were contract or common carriers or both. By virtue of § 32 (d) (3) of the 1959 amendment "rights lawfully acquired by any person prior to the effective date" of that amendment were not invalidated. Thus the obvious result is that § 33 (c) of the 1959 amendment was not necessary to protect the right of carriers holding permits under the 1954 act to continue their operations as contract carriers.

If those who qualified under the 1954 act had no need of the 1959 amendment to continue operations, the conclusion would seem inescapable that the "grandfather" provision in the later act was intended to give those carriers who could have qualified under the 1954 act had they filed timely applications another opportunity to obtain permits. It must be presumed that the legislature realized that the requirement in the 1959 amendment of continuous operation by such applicants presupposed that their operation would be contrary to the then existing law. Hence, it must follow that the irregularity of operation, stemming solely from the failure of these carriers to submit timely applications, was waived by the legislature when it adopted the 1959 amendment.

We hold, therefore, that § 33 (c) did create new "grandfather" rights in regard to applicants in bona fide operation as contract carriers of flammables on June 1, 1954, and continuously thereafter, who had failed to file timely applications under the 1954 act.

(2)

Appellants argue that, even conceding that § 33 (c) of the 1959 amendment created new "grandfather" rights, Scarborough and Morgan Transportation were not in bona fide operation during the critical period. Their contention is based

upon an interpretation of "bona fide" as meaning not only actual but also lawful operation, and they assert that since the appellees were not in continuous lawful operation from June 1, 1954, to the date of their applications they were not entitled to the permits issued to them. The appellees, on the other hand, contend that "bona fide" is not to be equated with "lawful", but, interpreting it in the context in which it is used, its meaning is "actual" as distinguished from "pretended".

We must, of course, under the guide lines hereinbefore mentioned, look to that interpretation which will effectuate the legislative intent. In the light of those considerations it seems clear to us that the words "bona fide" must be interpreted as "actual" and not "lawful" if the true legislative intent is to be realized. The word "lawful" implies that an act is "authorized, sanctioned, or at any rate not forbidden, by law." *Black's Law Dictionary,* 4th ed., p. 1032. It is commonly used, therefore, when a distinction is sought to be made from "unlawful". As was recognized by the chancellor, when the 1954 act went into effect on June 1st of that year, there was no requirement to obtain a permit thereunder until September 1, 1954. It follows that the operations of the carriers during the interim period were neither "lawful" in the sense that they were in compliance with a governing law, nor were they "unlawful" in that they violated any such law. As the chancellor observed, these operations represented "a factual state and not a legal status". Thus, a "bona fide" operation on the qualifying date must be interpreted to mean "actual", rather than "lawful". Furthermore, we agree with the view taken below that the clause in § 33 (c) "and has continued such operations since that date" refers back to the entire phrase "in bona fide operation as a contract carrier". This being so, the term "bona fide" cannot be given any wider meaning in the period of continued operation than it possessed on June 1, 1954. It must still be defined as "actual", and not "lawful".

The apposite cases are largely collected in 5 *Words and Phrases* (p. 119, 1961 Cum. Supp.). See also 4 *A.L.R.* 2d 699, 705. The general conclusion derived from these cases is that the common meaning of "bona fide operation" within a "grandfather clause" is "actual" and "substantial" as distin-

guished from incidental, sporadic, potential or simulated service. See, for example, *Elliott Brothers Trucking Co. v. United States, et al.,* 59 F. Supp. 328 (D. C. Md. 1945); *National Moving & W. Corp. v. Interstate Commerce Com'n,* 48 F. Supp. 284 (D. C. S. D. N. Y. 1942); *Alton R. Co. v. United States,* 315 U. S. 15 (1942). In the last case the Supreme Court remarked that in its opinion rights under the "grandfather clause" in the federal Motor Carrier Act of 1935 were not conditioned necessarily on compliance with state laws. "Their violation is material only in so far as it may be relevant to establishing an absence of 'bona fide operation'. * * * Such operation might well be in good faith though state laws were infracted. And the fact that an applicant may have to make his peace with state authorities does not necessarily mean that his rights under the 'grandfather clause' should be denied or withheld." (315 U. S. at page 24.)

The *Alton* case recognizes a distinction between carriers acting in *defiance* of state laws and those whose operations are merely unauthorized, citing as an example of the former *McDonald v. Thompson,* 305 U. S. 263 (1938). There a carrier who had previously been denied a permit on the ground that his proposed operation would create a burden and danger to the ordinary public use of the highways, nevertheless continued his operation. His subsequent operation was held not to be "bona fide" under such circumstances. It has also been held that the nature of the violation of state law should be considered in determining whether it has any effect on an otherwise bona fide operation. *Buechel Bus Company v. Whitaker,* 288 S. W. 2d 60 (Ky. 1956); 4 *A.L.R.* 2d 706.

In view of the aforegoing authorities, we conclude that the term "bona fide" as used in the 1959 statute must be interpreted to mean "actual". There is ample evidence in the record to support the finding of the Commission that Morgan Transportation and Scarborough were in actual and substantial operation during the critical period, and there is no indication that under the circumstances of this case the Commission found them operating in "defiance" of state law.

## (3)

The third contention of appellants relates solely to Scarborough. The point is made that Scarborough Oil Company, Inc., the present "applicant", was not itself in operation as a contract carrier of flammables on June 1, 1954, and continuously thereafter, within the meaning of § 33 (c) of Art. 78. The argument is grounded upon the fact that prior to the incorporation of Scarborough the business had been operated as a partnership, and upon the claim that, under the "grandfather clause", the rights of a predecessor in interest may not devolve upon a successor applicant so as to bring him within the provision calling for continuous operation from June 1, 1954.

In part, the Commission found the following facts as to Scarborough: "In April, 1954, Paul D. Scarborough and his mother operated the Scarborough Oil Company as a partnership and, as such, entered into a contract with Sherwood Brothers, now Sinclair, for the carriage of flammable liquids from Salisbury, Maryland, to a bulk plant in Berlin, Maryland. *Without interruption to the services performed under this contract* the partnership, in 1956, was incorporated under the name of Scarborough Oil Co., Inc. Paul D. Scarborough, one of the partners, now owns all of the corporation's stock and is President and General Manager." (Emphasis supplied.)

Four contracts for the carriage of flammables between Scarborough Oil Company, Inc., and its predecessor partnership, and Sinclair Refining Company and its predecessor, Sherwood Brothers, were entered in evidence. The record shows that while Scarborough was actually incorporated in 1952, the corporation did not take over the business until 1956. Only the last of the four contracts, effective December 19, 1956, was with the Scarborough Oil Company, Inc., the corporation that applied for and was granted the permit by the Commission.

The few appellate courts which have considered it are divided on the question of whether the operations of a predecessor in interest may be considered those of the applicant, for the purpose of qualifying under a "grandfather clause" similar to that in the Maryland statute. The two opposing views are analyzed in an annotation in 4 *A.L.R.* 2d 697-698. They have been referred to as the "Virginia rule" and the "Ohio rule".

The Virginia appellate court, in the case of *Carroll v. Commonwealth*, 125 S. E. 433 (Va. 1924), held that such operations of a predecessor in interest were sufficient to qualify a partnership under the "grandfather clause" then in effect in that State, which was similar to the Maryland statute. Application was made in that case in the name of a partnership. The Commission found as a fact that the firm, composed of two partners, was not operating on the determinative date. While this finding was adopted by the appellate court, it noted that the Commission also found as a fact that one of the partners was operating on the determinative date. In holding that the application should be approved, the court said:

"\* \* \* We think that the prime object the Legislature had in view, in restricting the granting of the certificates 'as a matter of right' to those who were actually operating over the routes for which such certificates were sought, on the date mentioned in the statute, was to restrict the number of motor vehicle carriers and the volume of traffic occasioned by them which might after the date mentioned use the improved public highways as a matter of right, to such number and volume as existed on such date; and, secondarily, in the attainment of that object, to take care not to put out of business any who were actually in good faith in the business on that date, or even curtail their business as it existed at that time \* \* \*. Such being our view of the statute, we are of opinion that the proper interpretation of the language of the statute, above specifically referred to, is that it directs the certificate to be granted to 'such person, firm, or corporation,' designated by the words of the statute (or to such of them as shall apply therefor, if more than one person, firm or corporation was conducting the operation over the route involved on February 28, 1923), either alone or along with such others as they, respectively, may request in their application therefor \* \* \*".
(125 S. E. at page 434.)

Likewise, the Virginia court held in *Bowman v. Commonwealth,* 125 S. E. 435 (Va. 1924), that the denial of a certificate to an individual applicant on the ground that on the critical date he was operating in partnership with another was erroneous. The court stated that with respect to the portion of the statute preserving to those who were engaged in the business on the critical date in good faith the right to continue therein if they applied as prescribed by the statute, the provision was satisfied if the privilege was granted to those of them who did apply, although all of them might not do so.

A result similar to the holdings in the Virginia cases was reached in *Railroad Comm. of Texas v. Rau,* 45 S. W. 2d 413 (Texas 1931). Under the Texas statute, containing a "grandfather clause" somewhat similar to ours, and also authorizing the sale or transfer of permits to operate bus companies with the permission of the Commission, the Texas court held that the right to a permit was a valuable right exclusive in the holder and subject to sale or transfer by him, even to one having no apparent connection with him, and that therefore the transferee could exercise his predecessor's right under the "grandfather clause" to obtain the permit.

The appellants urge, however, that the "Ohio rule", enunciated in the case of *Red Ball Transit Co. v. P. U. C. of Ohio,* 147 N. E. 762 (Ohio 1925), should be applied here. In that case a corporation applied for a permit under the Ohio statute, based on the "grandfather" rights of an individual who had been operating at the critical date and whose business had been transferred to the corporation. The corporation was wholly owned by the individual, who expressly requested that the certificate be issued in the name of the corporation. In holding that the right to a permit was personal to the individual and not transferable, and refusing to sanction the issuance of a permit to the corporation, the court adopted the reasoning in *Westhoven v. P. U. C. of Ohio,* 147 N. E. 759 (Ohio 1925), decided a week previously, in which it was said (at page 760) :

"That it was the intention of the Legislature, in the enactment of the Freeman-Collister Act, 110

Ohio Laws, 211, to make the certificate of convenience and necessity of the Public Utilities Commission personal to the 'persons [sic] or persons, firm or firms, co-partnership, or voluntary association, joint stock association, company or corporation,' seems apparent from the various provisions of the act, *not only by reason of the fact that no provision is made therein for the assignment or transfer of the certificate,* but by the various provisions requiring persons who operate or seek to operate in a representative capacity to first secure such a certificate from the Public Utilities Commission." (Emphasis supplied.)

It is obvious that considerable weight was given by the court in the *Westhoven* decision to the fact that no provision was made in the Ohio act for the assignment or transfer of such certificates.

It would appear, however, that the basis for application of the Ohio rule does not presently exist in Maryland. In the 1955 revision of Art. 78 the legislature by § 24 (b) (1) authorized the transfer of all public service permits, including those of carriers of flammables, upon prior authorization by the Commission. Thus the Ohio cases are not applicable, and the Virginia rule would seem to be in accord with the situation here. This Court has long recognized the transferability of utility franchises and rights, particularly when authorized by the legislature. *Potomac Power Co. v. Birkett,* 217 Md. 476, 143 A. 2d 485 (1958); *Crisfield v. Public Service Comm.,* 183 Md. 179, 36 A. 2d 705 (1944).

We are therefore of the opinion that, under applicable law, the prior operation of Paul D. Scarborough and Co., the partnership, on the qualifying date, was properly considered by the Commission as the operation of its successor, Scarborough Oil Company, Inc., the applicant.

(4)

The final contention of appellants is that Morgan Transportation is a "private carrier" within the meaning of § 2 (hh)

of Art. 78 and therefore is neither required to have, nor entitled to, a permit as a contract carrier of flammables. Section 2 (hh) provides:

> " *'Private carriers of flammables'* shall mean and include those carriers of flammable liquids in bulk, where the carrier is the owner of the cargo or carriage is for the purpose of sale or in the furtherance of a commercial enterprise to which carriage is incidental. All carriers in this class shall be specifically exempted from the provisions of this article."

Appellants' argument is based upon the premise that Morgan Transportation and C. Curtis Morgan Co. (Morgan Marketing), the latter of which is a marketer of Sinclair products and is a private carrier, are in fact one and the same corporation. Appellants point out that C. Curtis Morgan operated the entire enterprise, now consisting of the two corporations, as an individual prior to 1952, and that the establishment of Morgan Transportation in 1953 as a separate corporation did not enlarge the operation in any manner. Appellants describe the principal purpose of the enterprise as the handling of Sinclair products as marketer and distributor, with the transportation operation being merely incidental. Other facts are also pointed to: that the two companies occupy the same office; that Mr. Morgan, with his wife, owns both companies, and is president of both; that the two companies share certain facilities, as office space and other equipment; that employees are sometimes interchanged. All this, it is argued, goes to prove that the operations of Morgan Transportation are merely in furtherance of the operations of Morgan Marketing, and hence Morgan Transportation should also be considered a "private carrier".

In addition to the factors which appellants cite, however, the record also shows that Morgan Transportation is not the owner of the cargo it hauls, but rather that Sinclair Refining Company is the owner; that Morgan Transportation is the owner of the automotive equipment used in its operations, consisting of two semi-trailers and three tractors, of which two tractors and trailers operate every day, and that it uses

no transportation equipment of Morgan Marketing; that Morgan Transportation employs and pays its own employees and, though on occasion it does use an employee of Morgan Marketing, reimbursement is made to the latter company; that it also compensates Morgan Marketing for any repairs made on its automotive equipment. A final factor worthy of note is that Morgan Transportation was incorporated and began its operations as a carrier on August 26, 1953, more than nine months before June 1, 1954, the qualifying date of the original act. This would indicate clearly that it was not created for the purpose of taking advantage of the "grand-father" rights provided by the 1954 act.

Whether or not Morgan Transportation is a mere instrumentality of Morgan Marketing and identical with it was a matter of fact for the Commission to determine if there was substantial evidence on which it could base a finding. See 1 Fletcher, *Cyc. Corp.*, § 43 (Rev. ed. 1931). As this Court stated in *Danzer & Co. v. Western Md. Rwy. Co.*, 164 Md. 448, 457, 165 Atl. 463 (1933), "There are cases, of course, in which the corporation is used as a mere shield or name for the perpetration of a fraud, in which the courts will look beyond the corporate fiction to the realities which it screens, but this is not such a case * * *". Nor do we feel that the facts before us present such a case. See also *Md. Trust Co. v. Tulip Realty*, 220 Md. 399, 414, 153 A. 2d 275 (1959), and Brune, *Maryland Corporation Law and Practice*, § 371 (Rev. ed. 1953). We feel, as the chancellor did, that there was substantial evidence before the Commission to support a finding that Morgan Transportation was a separate and distinct entity from Morgan Marketing, and that Morgan Transportation was qualified to receive a contract carrier permit.

Since we find that the issuance of the permits in this case was within the statutory authority of the Commission, and is supported by substantial evidence on the record, the order of the chancellor sustaining the Commission's order and dismissing appellants' petition must be affirmed. Code (1957), Art. 78, § 97.

*Order affirmed; appellants to pay the costs.*